UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NORTHEAST RESEARCH, LLC,

                        Plaintiff,

        v.

ONE SHIPWRECKED VESSEL, her Tackle,
  Equipment, Appurtenances and Cargo
  located within two nautical miles of a circle
  with the center point at the coordinates
  42 degrees 33 minutes North Latitude, and
  79 degrees 36 minutes West Longitude,

                      *in rem*,
                      Defendant,

STATE OF NEW YORK,

                      Claimant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**04-CV-00645A(F)**

APPEARANCES:        JOHN KUZDALE, ESQ.
                              Attorney for Plaintiff
                              314 Central Avenue
                              Dunkirk, New York 14048

                              JOHN F. PRESCOTT, JR., ESQ.
                              Attorney for Plaintiff
                              63 Cardy Lane
                              Depew, New York 14043

                              LAW OFFICE OF PETER E. HESS, ESQ.
                              Attorney for Plaintiff
                              PETER E. HESS, of Counsel
                              P.O. Box 7753
                              Wilmington, Delaware 19803-7753

ANDREW M. CUOMO
Attorney General, State of New York
Attorney for Defendant
DAVID J. STATE
Assistant New York Attorney General, of Counsel
Main Place Tower
Suite 300A
350 Main Street
Buffalo, New York 14202

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on

September 29, 2004, for pretrial matters, including report and recommendation on

dispositive motions.  The matter is presently before the court on motions for summary

judgment filed by Claimant on July 31, 2009 (Doc. No. 41), and by Plaintiff on August 4,

2009 (Doc. No. 51).

## BACKGROUND and FACTS[1]

Plaintiff NorthEast Research, LLC ("NorthEast" or "Plaintiff"), is a Massachusetts

limited liability company with its principal place of business in Dunkirk, New York, and is

engaged in the business of locating and salvaging submerged shipwrecks.  On August

6, 2004, Plaintiff commenced this admiralty *in rem* action by filing a complaint against

One Shipwrecked Vessel located in 170 feet of freshwater in the New York waters of

Lake Erie, asserting, under maritime law, title to Defendant One Shipwrecked Vessel,

her tackle, equipment, appurtenances and cargo, located within 200 nautical miles of a

circle with the center point at the coordinates 42 degrees 33 minutes North latitude, and

---

[1] The Facts are taken from the pleadings and motion papers filed in this action.

79 degrees 36 minutes West longitude ("the site"), also known as "the Dunkirk Schooner,"[2] ("the shipwreck," "the Dunkirk Schooner," or "the Defendant Vessel,"), pursuant to the law of finds and, alternatively, seeking a salvage award under the law of salvage. Upon filing the Complaint, Plaintiff also moved for (1) issuance of a warrant of arrest, pursuant to Federal Rules of Civil Procedure Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") Rule C(3)(a)(ii), granting only Plaintiff the right to document, recover and preserve the Defendant Vessel, (2) an order *in rem* appointing Plaintiff as custodian of the Dunkirk Schooner, and (3) appointment as special process server.[3] On August 9, 2004, Chief District Judge Arcara granted all three motions, issuing a warrant of arrest for the Defendant Vessel, and appointing Plaintiff as custodian of, and ordering Plaintiff to post process upon, the Defendant Vessel.

Intervening as Claimant, on September 7, 2004, the State of New York ("Claimant" or "New York"), filed an answer (Doc. No. 15) ("Answer") asserting title to the Defendant Vessel under the Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101 *et seq.* ("the ASA"), and New York Education Law § 233.[4] Claimant also objected to

---

[2] A name created by Plaintiff for this action.

[3] "In an *in rem* admiralty action, the arrest of a shipwreck is the procedure by which a salvor establishes jurisdiction in federal court." *Great Lakes Exploration Group, LLC v. Unidentified Wreck and (For Salvage-Right Purpose), Abandoned Sailing Vessel*, 522 F.3d 682, 686 (6th Cir. 2008) (citing 2-II Benedict on Admiralty § 22 (7th ed.) (explaining that "an admiralty court by seizure in rem acquires jurisdiction of all interests in the res"); 2 Am.Jur.2d Admiralty § 32 (2007) ("generally, to complete the court's jurisdiction, the res must be seized and be under the control of the court.")).

[4] Although denominated in the Answer as its "First Defense," Claimant's assertion that, by virtue of the ASA, title to the Defendant Vessel is in New York, Answer ¶ 6, and request for a declaration that New York is the lawful and legal owner of the Defendant Vessel, is more properly regarded as a counterclaim because it seeks the same relief sought by Plaintiff, based on the same facts. *See Cardinal Chem. Co. v. Morton Int'l, Inc.*,508 U.S. 83, 93 (1993) (holding that where a defendant to patent

Plaintiff's appointment as the Defendant Vessel's custodian, requesting that Claimant or, alternatively, the United States Marshal for the Western District of New York, be designated as the proper custodian, and requesting Plaintiff be required to post a sufficient bond as required under 28 U.S.C. § 2464 (providing for the United States marshal to discharge the arrested property upon receiving from the respondent or claimant of the property for which warrant of arrest has been issued a bond or stipulation in double the amount claimed by the libellant). Claimant further requested a declaration as the Defendant Vessel's lawful and legal owner and an order enjoining Plaintiff from any further disturbance of the Defendant Vessel.

On July 31, 2009, Claimant filed a motion for summary judgment (Doc. No. 41) ("Claimant's Motion"), arguing Claimant should be granted title to the Defendant Vessel. Claimant's Motion is supported by the attached Memorandum of Law in Support of the State of New York's Motion for Summary Judgment (Doc. No. 41-2) ("Claimant's Memorandum"), a Statement of Undisputed Facts (Doc. No. 42) ("Claimant's Undisputed Facts"), the Declaration of Assistant New York Attorney General David J. State ("State") (Doc. No. 43) ("State Declaration"), with attached exhibits A through D ("State Declaration Exh(s). __"), the Declaration of Dr. Christina B. Rieth ("Dr. Rieth") (Doc. No. 44) ("Dr. Rieth Declaration"), with attached exhibits A through I ("Dr. Rieth Declaration Exh(s). __"), the Declaration of Mark Peckham ("Peckham) (Doc. No. 45) ("Peckham Declaration"), with attached exhibits A through C ("Peckham Declaration

_____

infringement action asserts a counterclaim seeking a declaration that the subject patent is invalid, rather than merely raising the patent's invalidity as an affirmative defense, the district court should address the validity issue). As such, the court construes Claimant's First Defense as a counterclaim. Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly designates . . . a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.").

Exh(s). __"), the Affidavit of Alan C. Bauder ("Bauder") (Doc. No. 46) ("Bauder Affidavit"), and the Declaration of Claimant's Expert Witness Arthur B. Cohn ("Cohn") (Doc. No. 47), attached to which is Cohn's Expert Witness Report (Doc. No. 47-2) ("Cohn Report"), and Cohn's Supplemental Expert Witness Report (Doc No. 47-3) ("Cohn Supplemental Report").

On August 3, 2009, Plaintiff filed a motion for partial summary judgment (Doc. No. 51) ("Plaintiff's Motion"), asserting Claimant has failed to provide clear and convincing evidence to rebut Plaintiff's claim that the Dunkirk Schooner is the *Caledonia/General Wayne*, which has not been abandoned, and as to which Plaintiff should be allowed to continue its salvage operations. Plaintiff's Motion is supported by the attached Declaration of Peter E. Hess, Esq. ("Hess") (Doc. No. 51-3) ("Hess Declaration"), with attachments I through III ("Hess Declaration Attachment(s). __"), and the separately filed Plaintiff's Statement of Undisputed Facts (Doc. No. 48) ("Plaintiff's Undisputed Facts"), and Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment (Doc. No. 49) ("Plaintiff's Memorandum").

On November 13, 2009, Claimant filed a Memorandum of Law in Response to the Plaintiff's Motion for Summary Judgment (Doc. No. 57) ("Claimant's Reply"), a Counter Statement of Facts in Response to Plaintiff's Statement of Undisputed Facts (Doc. No. 58) ("Claimant's Counter Statement of Facts"), the Declaration of David C. Hyland ("Hyland") (Doc. No. 59) ("Hyland Declaration"), the Declaration of Nancy Potter (Doc. No. 60) ("Potter Declaration"), and the Reply Declaration of Assistant New York Attorney General David J. State (Doc. No. 61) ("State Reply Declaration"). Oral argument was deemed unnecessary.

Based on the following, Claimant's Motion should be GRANTED; Plaintiff's Motion should be DENIED.

## **FACTS**[5]

The parties agree that the Defendant Vessel, embedded on submerged lands of New York in the eastern basin of Lake Erie near Dunkirk, is a Great Lakes schooner, a two-masted wooden sailing ship, approximately 80 feet in length on deck, 19 feet in beam, the precise identity of which is disputed by the parties. Although Plaintiff maintains the schooner was built between 1790 and 1810, Claimant asserts Defendant Vessel more likely was built around 1830.

Richard Weston Kullberg ("Kullberg"), is the operator of NorthEast, and is engaged in the business of locating and salvaging submerged shipwrecks. Although NorthEast was not incorporated until 2004, Plaintiff maintains that the Dunkirk Schooner was first "dived," *i.e.*, located by visual observation, by NorthEast in the "early 1990's [*sic*]." Plaintiff's Undisputed Facts § 1. The Dunkirk Schooner is the first shipwreck find in which Kullberg has been involved. After obtaining the court's August 9, 2004 order appointing Plaintiff as custodian of the shipwreck, Plaintiff assembled a team of accomplished shipwreck divers, to document its find. *Id*. ¶ 6. Because of the depth of the water in which the Dunkirk Schooner rests – 170 feet of freshwater – "'technical' diving – that is, beyond the range of ordinary sport divers," including technically certified divers, with regard to depth, temperature, decompression needs,

---

[5] Taken from the pleadings and motion papers filed in this action.

and breathing apparatus, must be used to dive the shipwreck. *Id*. ¶ 7. Plaintiff maintains its divers are the only persons to have lawfully dived on the Dunkirk Schooner, pursuant to the arrest warrant, capturing both video and still photographic images of the Defendant Vessel, along with several artifacts, and is aware of no other divers capable of safely diving the shipwreck other than interlopers brought to the shipwreck site by one Captain Jim Herbert ("Herbert") of Osprey Charters, a diving charter company. *Id*. ¶ 9.

According to Plaintiff the Dunkirk Schooner, although a shipwreck, is "remarkably pristine and intact" (Plaintiff's Undisputed Facts ¶ 1), in part because the temperature of the water in which the Dunkirk Schooner is located "has not been observed to rise above 37 °F, which has contributed to the remarkable state of preservation of the shipwreck." *Id*. ¶ 5. NorthEast has retained Kenneth J. Vrana ("Vrana"), and James R. Reedy, Jr. ("Reedy"), of the Center for Maritime & Underwater Research Management ("CMURM"), to prepare an underwater archaeological report on the wreck. On May 16, 2008, Vrana, on behalf of Plaintiff, applied to the New York State Education Department, New York Museum ("State Museum"), for a permit authorizing the collection and excavation of the Dunkirk Schooner, pursuant to N.Y. Educ. Law § 233[4] ("§ 233[4]"), which requires written permission from the New York State Commissioner of Education to examine, excavate or gather archaeological materials from state lands, including underwater lands owned by the state. ("§ 233 Permit"). As explained by Christina B. Rieth, Ph.D. ("Dr. Rieth"), State Archaeologist for Research and Education at the State Museum, "[if] the permit application is approved, the artifacts and associated documentation resulting from such excavations become part of the State

Museum's collections unless placed in other custody by a specific law. Individuals receiving permits are required to complete a Curation Agreement acknowledging the public ownership of the artifacts and committing to the processing and preparation of these materials in accordance with the State Museum's policies regarding collections acquisition and care." Dr. Rieth Declaration ¶ 21. Plaintiff does not dispute the schooner is within the ambit of § 233[4].

On June 4, 2008, Dr. Rieth, in accordance with her archaeologist position with the State Museum, approved the application, and issued a § 233 permit ("§ 233 Permit"),[6] valid for the dates June 1 through August 30, 2008, subject to several conditions, including that (1) Vrana enter into a curation agreement with New York State Museum for any artifacts recovered if the Dunkirk Schooner site is ultimately determined by a court to be under New York's jurisdiction; (2) Vrana must filed a copy of a project report by November 30, 2008; and (3) "[i]n the event that human remains are recovered from the shipwreck, the State Museum must be contacted in decision-making related to the removal and/or analysis of these remains." § 233 Permit. Mercyhurst Archaeological Institute ("MAI"), in Erie, Pennsylvania, was chosen as the curator for any artifacts recovered. After the § 233 Permit was issued, additional diving on the Dunkirk Schooner was conducted by CMURM for Plaintiff, during which several artifacts were recovered from the vessel. Prior to obtaining the § 233 Permit, Plaintiff retrieved several artifacts from the shipwreck, including two compasses, one lantern, a small piece of glass, and a piece of wood. Claimant's Undisputed Facts ¶ 65 (citing

_____

[6] Exhibit E to Dr. Rieth Declaration.

Kullberg Deposition Transcript ("Kullberg Deposition T."[7]) at 35).

On August 22, 2008, Reedy contacted Dr. Rieth by e-mail, reporting on the project's progress and requesting a one-month extension of the project's deadline from August 30, 2008 to September 30, 2008, because of poor weather and mechanical issues encountered during the site investigation.  By e-mail message dated August 22, 2008, Dr. Rieth approved the requested extension, and reminded Reedy of the high probability human remains would be found on the wreck, advising that the presence of personal artifacts in the cabin suggested the Dunkirk Schooner sank with the crew still on board.  On August 28, 2008, Reedy acknowledged the § 233 Permit extension, and expressed his concurrence that "the possibility of the presence of human remains is a major concern."  Reedy August 28, 2008 e-mail.[8]

Despite the extension, on October 21, 2008, Dr. Rieth suspended the § 233 Permit upon receiving information of § 233 Permit violations.  Dr. Rieth October 21, 2008 Letter[9] at 1.  Such violations included the removal and dismantling of planks from the schooner's cabin roof, dredging the cabin of its contents and the haphazard deposit of a table and other furniture on the vessel's deck, "resulting in a loss of contextual information from the association of materials contained in the shipwreck," the recovery and removal of  human remains from the vessel's cabin without the requisite notice to the Commissioner of Education and the State Museum, and the continued diving at the shipwreck beyond the § 233 Permit's expiration date of September 30, 2008.  *Id*.

---

[7] Exhibit A to State Declaration.

[8] Exhibit G to Dr. Rieth Declaration.

[9] Exhibit H to Dr. Rieth Declaration.

On October 28, 2008, Dr. Rieth received from Reedy an artifact log listing all the artifacts recovered from the Dunkirk Schooner between June 1, and August 31, 2008, including 15 personal and utilitarian artifacts, but no reference to the recovery of any human remains.  On December 5, 2008, Dr. Rieth received a copy of CMURM's 2008 Annual Report of Investigation on New York State Archaeological Site No. 01321.000032, The Dunkirk Schooner, prepared by Reedy and Vrana ("CMURM Report"),[10] in which the recovery of human remains, including bones, is not mentioned.

Among the items recovered from the shipwreck's cabin are a ring, a pocket watch, compasses, an oil lamp, window glass fragment, an earthenware jug, porcelain shards, several coins, the newest of which is dated 1834, and some grain from the ship's cargo hold.  Four of the artifacts, along with samples of the grain cargo and sediments from the vessel's forehold were delivered to MAI for conservation and analysis, whereas the remaining artifacts Plaintiff determined were not of diagnostic value and have been retained by Plaintiff.  Kullberg maintains that human remains were recovered from the Dunkirk Schooner, and were placed in bags and stored in a freezer storage unit near Dunkirk, New York.  NorthEast later confirmed human remains, including bones, were removed by it from the wreck and samples from the human bones were sent for DNA analysis to the Armed Forces Institute of Pathology in Rockville, Maryland, without New York's knowledge or approval.  According to the DNA analysis report, it was not possible to "conclude with 100% certainty that the individual is Western European, but the likelihood favors that this is not an individual of African

_____

[10] Exh. I to Dr. Reith Declaration.

ancestry." Dr. Rieth Declaration ¶ 36.

According to Plaintiff, the Dunkirk Schooner is actually the *Caledonia*, built on the River Rouge, south of Detroit, as a schooner in 1799 by the British North West Trading Company, for use in the fur trade, making voyages between Fort Erie, Canada, and Mackinac, Michigan. At the outbreak of the War of 1812, the Upper Great Lakes were under British control, and the *Caledonia* was conscripted for British military service, converted from a schooner to a brig-of-war, with two square-rigged masts and outfitted with guns, and used to transport British troops. In 1813, while anchored at Fort Erie, an American boarding party boarded the *Caledonia*, surprising her crew, and captured the vessel for the United States, conscripting the vessel into the United States Army. Later that year, the vessel participated in the Battle of Lake Erie under the command of Admiral Perry, and then carried American troops into the Detroit River,[11] invaded Southern Ontario, and reestablished Detroit. Plaintiff's Undisputed Facts ¶ 44. In 1814, the *Caledonia* sailed with a squadron sent to recapture Fort Mackinac. Immediately following the signing of the Treaty of Ghent on December 24, 1814, thus ending the War of 1812, the *Caledonia* sailed to Lake Michigan to reestablish Fort Dearborn, in what is now Chicago.

After the War of 1812, some military downsizing occurred, and the *Caledonia* was sold in 1816 to Pennsylvania merchants Rufus Reed ("Reed") and John Dickson ("Dickson"), who refitted the vessel as a commercial schooner, renamed as the *General*

---

[11] The court takes judicial notice that the Detroit River is actually a strait, flowing for 32 miles from Lake St. Clair to Lake Erie, constituting the international border between the United States at Detroit, Michigan, and Canada at Windsor, Ontario.

*Wayne*, Plaintiff's Undisputed Facts ¶ 44, and used the vessel to ferry run-away slaves across Lake Erie to freedom in Canada as part of the Underground Railroad. Plaintiff's Undisputed Facts ¶ 55. The last documented evidence of the *General Wayne* clearing any Great Lakes port is 1818.[12] In support of summary judgment, Plaintiff obtained from one Hannah Reed Mays ("Mays"), a direct descendent of Rufus Reed, an Assignment of Ownership Interest & Claim of Title ("Mays Assignment"),[13] by which Mays attempts to convey to Plaintiff all her rights, title and interest, if any, in the Dunkirk Schooner.

Claimant has retained as an expert witness Arthur B. Cohn ("Cohn"), co-founder and Executive Director of the Lake Champlain Maritime Museum ("LCMM"), in Vergennes, Vermont. In that capacity, Cohn oversees underwater archaeological projects in Lake Champlain and other bodies of water, including Lake Erie. Based on Cohn's research, Claimant maintains the Dunkirk Schooner was more likely a "nameless 1830s schooner that sank carrying grain." Expert Witness Report of Arthur B. Cohn ("Cohn Report")[14] ¶ 56. The amount of cargo, including grain and hickory nuts, recovered from its cargo hold suggest the vessel sank with a full cargo load while traveling east on Lake Erie, in the fall, when grains in the Midwest are harvested and hickory nuts are plentiful. *Id*. ¶ 14.

Raising the Dunkirk Schooner from the Lake Erie basin would require wrapping

---

[12] Plaintiff's asserted history of the schooner as the *Caledonia* has not, according to the record, been historically verified and depends on the accuracy of Plaintiff's claim that it is, in fact, the *Caledonia*.

[13] Hess Declaration Attachment III.

[14] Cohn Declaration Exh. A.

straps at 18" intervals around the vessel, blowing air underneath, and strapping the vessel to 55 gallon drums filled with air.

On March 4, 2009, the Dunkirk Schooner was determined eligible for listing in the National Register of History Places ("the National Register"), and was listed on the National Register on May 1, 2009. On March 20, 2009, the Dunkirk Schooner was listed on the New York State Register of Historic Places ("the State Register").


**DISCUSSION**

**1.    Summary Judgment**

Plaintiff and Claimant both seek summary judgment, with Plaintiff asserting the Dunkirk Schooner is not abandoned and, as such, Plaintiff has a valid salvage claim to the vessel, and Claimant asserting a superior claim to title to the Defendant Vessel, which has been abandoned. Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322. "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in

the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)

(quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  Once a party moving

for summary judgment has made a properly supported showing of the absence of any

genuine issue as to all material facts, the nonmoving party must, to defeat summary

judgment, come forward with evidence that would be sufficient to support a jury verdict

in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d

Cir. 1995).

    Claimant's motion is made pursuant to the Abandoned Shipwreck Act of 1987,

43 U.S.C. §§ 2101 *et seq.*, ("the ASA" or "the Act"), State's Memorandum at 3-11, the

Submerged Lands Act of 1953, 43 U.S.C. § 1311 ("the SLA"), *id.* at 12, and various

New York laws, including New York Education Law § 233 ("§ 233"), *id.* at 13-15, New

York Public Lands Law §§ 3 and 75, *id.* at 15, and New York Navigation Law §§ 2[33]

and 130-a, *id.* at 15-16.  Claimant maintains that its claims of ownership under Federal

and State law do not require the court to resolve the issue of the Dunkirk Schooner's

identity, characterizing Plaintiff's assertions regarding the identity as "weak" and not

supported by undisputed facts.  *Id*. at 16-21.  Claimant maintains all the evidence

establishes the Dunkirk Schooner's flat-bottomed hull and parallel sides are consistent

with a vessel designed to fit inside the Welland Canal, which opened in 1929, rendering

the Dunkirk Schooner too new to be the *Caledonia*/*General Wayne*, and that the

dimensions of the Dunkirk Schooner do not match those of the *Caledonia/General

Wayne*.  *Id*. at 19-20.

    Claimant further argues that because New York has a colorable claim to the

Dunkirk Schooner, the Eleventh Amendment divests this court of admiralty jurisdiction

over this action, *id*. at 23-25, principles of equity mandate that the Plaintiff's assertion of title should fail as a matter of law, *id*. at 25-29, and that sovereign immunity bars Plaintiff's salvage claim. *Id*. at 29. As such, Claimant seeks a declaration that title to the Dunkirk Schooner is vested in New York, an order enjoining Plaintiff from any further disturbance of the Dunkirk Schooner, and directing Plaintiff to log and immediately return to New York any objects, artifacts or other items removed from the Defendant Vessel. *Id*. at 30.

Plaintiff's motion is based on the maritime law of finds, asserting that the Dunkirk Schooner is not abandoned and, thus, the ASA does not apply.[15] Plaintiff's Memorandum at 8-13. Plaintiff alternatively asserts, under the law of salvage, the Dunkirk Schooner is not abandoned and, as such, Plaintiff is entitled to rely on this court's admiralty jurisdiction until the conclusion of its salvage operations, and is entitled to "a liberal salvage award."[16] *Id*. at 20-25.

In further support of summary judgment, Claimant characterizes Plaintiff's motion for summary judgment as containing "numerous irrelevant and erroneous factual statements, none of which support its motion for summary judgment." Claimant's Reply at 1. Claimant also reiterates several of its arguments asserted in support of Claimant's Motion, including that Plaintiff's discovery efforts involved the desecration and illegal recovery of human remains in violation of the § 233 Permit, *id.* at 3-5, Plaintiff misrepresented the facts regarding storage of the recovered human remains, *id.* at 5-6,

---

[15] Plaintiff fails to explain how, if the Defendant Vessel is not abandoned, Plaintiff can be declared its owner.

[16] Plaintiff's alternative claim for a salvage award from New York inherently concedes New York is the Defendant Vessel's owner.

and that Plaintiff unnecessarily made statements accusing a non-party of looting the site of the Defendant Vessel. *Id*. at 6 - 7. Claimant repeats its assertion that its claims of ownership under both federal and state law do not require resolution of the Dunkirk Schooner's identity, *id.* at 7-10, that Claimant is the Defendant Vessel's presumptive owner, *id.* at 10, and that the Defendant Vessel is abandoned under the ASA. *Id*. at 10-11.

**2.     Jurisdiction and Eleventh Amendment Immunity**

Preliminarily, the court addresses whether the Eleventh Amendment divests this court of admiralty jurisdiction over the action. Claimant argues that based on its colorable claim to title to the Dunkirk Schooner, the Eleventh Amendment divests this court of jurisdiction, requiring dismissal of the action pursuant to Fed. R. Civ. P. 12(h)(3) (requiring dismissal of an action "[i]f the court determines at any time that it lacks subject-matter jurisdiction . . . ."). Claimant's Memorandum at 23-25. Because Plaintiff did not file any papers in response to Claimant's Motion, Plaintiff has not responded to this argument.

"The Eleventh Amendment provides that the 'Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the . . . States' by citizens of another State, U.S. Const., Amdt. 11, and (as interpreted) by its own citizens." *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 618 (2002) (quoting *Hans v. Louisiana*, 134 U.S. 1 (1890)). A state, however, "remains free to waive its Eleventh Amendment immunity from suit in a federal court." *Lapides*, 535 U.S. at 618 (citing *Atascadero State Hospital v. Scanlon*,

473 U.S. 234, 238 (1985) (holding state may waive Eleventh Amendment immunity)). The Supreme Court "has made clear in general that 'where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.'" *Id.* at 619 (quoting *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947)) (italics in original).

The Supreme Court has recognized that the ASA engages with the Eleventh Amendment, holding that when a state does not have actual possession over the *res*, *i.e.*, the shipwrecked vessel, the Eleventh Amendment does not bar a federal court from determining the rights of the parties under either maritime law or the ASA. *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 506-08 (1998) ("*Deep Sea Research*"). Where a state's Eleventh Amendment immunity is involved, the state need not consent to the federal court's jurisdiction or otherwise waive its immunity. *Aqua Log, Inc. v. Georgia*, 594 F.3d 1330, 1333 (11th Cir. 2010) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 66, 675 (1999)). To invoke eleventh Amendment immunity, the state must "have 'a colorable claim to possession' of the res," *id.* (quoting *Fla. Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982)), and "must be in possession of the res." *Id.* (citing *Deep Sea Research*, 523 U.S. at 507-08). "As a result, so long as a state has not yet taken actual possession of a shipwreck, federal courts have jurisdiction to determine whether the ASA is applicable." *Great Lakes Exploration Group, LLC v. Unidentified Wrecked and (For Salvage-Right Purposes), Abandoned Sailing Vessel*, 522 F.3d 682, 688 (6th Cir. 2008) ("*Great Lakes Exploration*") (citing *Deep Sea Research*, 523 U.S. at 507-08). If,

however, the state is in actual possession of the of the shipwreck, or otherwise satisfies the ASA's title requirements, the federal courts will lack jurisdiction over a salvor's *in rem* admiralty action. *Great Lakes Exploration*, 522 F.3d at 688 (citing *Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel or Vessels*, 352 F.Supp.2d 1218, 1227 (S.D. Ala. 2005) (explaining Eleventh Amendment does not bar a federal court from determining salvage rights so long as the state is not in actual possession of the res); and *Zych v. Unidentified, Wrecked, and Abandoned Vessel, Believed to be SB Seabird*, 811 F.Supp. 1300, 1315 (N.D.Ill. 1992) (holding if a state holds title to a shipwreck, federal courts lack jurisdiction over claims for salvage)), *aff'd*, 19 F.3d 1136 (7th Cir.), *cert. denied*, 513 U.S. 961 (1994).

This rule is consistent with the Supreme Court's articulation that when a state does not have actual possession over the *res*, *i.e.*, the shipwrecked vessel, the Eleventh Amendment does not bar a federal court from determining the rights of the parties under either maritime law or the ASA. *Deep Sea Research*, 523 U.S. at 506-08 ("Although the Eleventh Amendment bars federal jurisdiction over general title disputes relating to state property interests, it does not necessarily follow that it applies to *in rem* admiralty actions, or that in such actions, federal courts may not exercise jurisdiction over property that the State does not actually possess."). "Because the Eleventh Amendment permits federal courts to hear claims under the ASA only if a shipwreck is *not* already in the actual possession of the state, the definition of 'possession' is significant." *Great Lakes Exploration*, 522 F.3d at 688 (italics in original). Possession repeatedly "has been defined to mean actual possession, not merely constructive possession." *Id*. (citing *Deep Sea Research*, 523 U.S. at 506-07; and *Fairport*, 177

F.3d at 497 n. 3).  Whereas constructive possession may be found based on ownership, dominion or control over the premises on which the *res* is located, or knowledge of the *res*, combined with the ability to maintain control over or to reduce it to physical possession, without actual personal dominion, actual possession generally requires either physical possession of, or actual personal dominion over the res.  *Aqua Log, Inc.*, 594 F.3d at 1336-37 (citing cases).

In the instant case, Claimant asserts only constructive possession of the Dunkirk Schooner.  *See* Claimant's Memorandum at 14 ("the State of New York is the presumptive owner of the shipwreck and is in 'constructive possession' of the shipwreck"); Claimant's Reply at 7 (asserting various New York statutes "establish the State as presumptive owner of the shipwreck and in constructive possession of the vessel"), and 10 ("by virtue of State Law, the State of New York is the presumptive owner of the shipwreck and is in 'constructive possession' of the shipwreck").[17]  Nor does the record contains any evidence that Claimant physically possesses the Dunkirk Schooner, so as to establish actual possession by New York.  *Aqua Log, Inc.*, 594 F.3d at 1336-37.   Nor is the court bound to accept as true Claimant's assertion that it only constructively possesses Defendant Vessel.  *See LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (court is "not bound to accept as true legal conclusions couched as factual allegations."). Furthermore, although Claimant, by cancelling Plaintiff's § 233 permit, has exhibited some physical control

---

[17] The State also asserts that "Plaintiff's assertion as an undisputed fact that the 'State of New York has never had actual possession' of the shipwreck is both incorrect and legally irrelevant," State's Reply at 10 (quoting Plaintiff's Undisputed Facts ¶ 10), and makes no attempt to reconcile the apparent inconsistency of this statement with the State's multiple assertions that it is in "constructive," rather than "actual" possession of the Defendant Vessel.

over the Dunkirk Schooner, such control is insufficient to invoke Eleventh Amendment immunity so as to divest this court of its admiralty jurisdiction over the action. *See Aqua Log*, Inc., 594 F.3d at 1337 (holding state not entitled to Eleventh Amendment immunity over *in rem* admiralty action in which salvors sought title to or salvage award for certain valuable logs lying on bottom of state's rivers because state performed no act of physical control over the logs, no state officials were present when logs were seized, and state's location of logs using sonar technology, patrolling rivers, and enactment of statutory scheme conferring legal ownership and control over logs demonstrated, at most, constructive possession).

Furthermore, even if Claimant has, by rescinding Plaintiff's § 233 Permit, asserted sufficient control over the vessel so as to invoke Eleventh Amendment immunity from the instant action, Claimant's reliance on the ASA as a defense to this action, is actually a counterclaim brought under the ASA for declaratory relief, *i.e.*, a judicial determination that New York is the owner of the Dunkirk Schooner. By seeking such declaratory relief, Claimant has waived its Eleventh Amendment immunity. *See Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 619 (2002) (holding state is deemed to have invoked the court's jurisdiction when it has made a voluntary appearance in federal court). Accordingly, Claimant has waived Eleventh Amendment immunity to this action, and Claimant's motion for summary judgment on this basis should be DENIED.


3.      **Federal Law**

The Constitution provides that "[t]he judicial power shall extend . . . to all Cases

of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2, cl. 1.  "The purpose of

Article III's admiralty and maritime jurisdictional grant was to place the admiralty and

maritime law under national control because of its intimate relation to navigation and to

interstate and foreign commerce."  *Zych v. Unidentified, Wrecked and Abandoned*

*Vessel, Believed to be the "Seabird"*, 19 F.3d 1136, 1139 (7th Cir. 1994) (citing *Panama*

*R.R. v. Johnson*, 264 U.S. 375, 385 (1924)).  *See also Foremost Insurance Co. v.*

*Richardson*, 457 U.S. 668, 674 (1982) (explaining "the primary focus of admiralty

jurisdiction is unquestionably the protection of maritime commerce. . . .").  Typical

admiralty matters include those related to commercial vessels and their operators,

involving maritime contracts or torts on navigable waters.  *Zych v. Unidentified,*

*Wrecked and Abandoned Vessel, Believed to be the SB  "Seabird"*, 811 F.Supp. 1300,

1307 (N.D.Ill. 1992) (citing cases), *aff'd*, *Zych*, 19 F.3d 1136 (7th Cir. 1994).  As such,

federal courts have admiralty jurisdiction over claims pursuant to maritime law.  *See*

*Preston v. Frantz*, 11 F.3d 357, 358 (2d Cir. 1993) (holding that even if plaintiff asserts

diversity as jurisdictional basis, court maintains admiralty jurisdiction over action to

which maritime law applies).

The exercising of admiralty jurisdiction has generally been extended to shipwreck

cases either on the basis of the law of salvage or the law of finds.  *Treasure Salvors,*

*Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 567-68 (5th

Cir. 1981) (holding district court had admiralty jurisdiction to entertain salvor's claim that

other salvors were wrongfully interfering with salvage operations of sunken sailing

vessel under maritime laws of salvage and finds).  *See also Fairport International*

*Exploration, Inc. v. The Shipwrecked Vessel Captain Lawrence* (heretofore, "*Fairport*"),

177 F.3d 491, 498 (6th Cir. 1999) (observing that historically, many courts have allowed those wishing to assert a right to a sunken ship to proceed pursuant to the maritime law of either salvage or finds). "Salvage is a reward given to persons who save or rescue a ship or a ship's goods from shipwreck, fire, or capture." *Zych*, 19 F.3d at 1141 (citing *Cope v. Vallette Dry Dock Co.*, 119 U.S. 625, 628 (1887); and *The "Sabine"*, 101 U.S. 384 (1880)). The law of salvage "originally developed to offer economic incentives to seamen observing ships and cargo in immediate marine peril to undertake rescue efforts." *Zych*, 811 F.Supp. at 1307. "The law of salvage applies when the original owner retains an ownership interest in the ship; a salvor receives a salvage award, but not title to the ship." *Fairport*, 177 F.3d at 498 (citing *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir. 1981)). If a salvor satisfies three elements for a valid salvage claim, including (1) maritime peril; (2) voluntary service rendered without an existing duty or contract; and (3) success, such that the salvor's efforts contributed to saving the salvaged property, the court may order the vessel's owner to pay the salvor a salvage award. *Zych*, 19 F.3d at 1141.

With regard to the law of finds, abandoned property does not have an owner. Ray Andrews Brown, *The Law on Personal Property*, § 8 (2d ed. 1955). The common law of finds, expresses "the ancient and honorable principle of 'finders, keepers.'" *Martha's Vineyard Scuba HQ v. Unidentified Vessel*, 833 F.2d 1059, 1065 (1st Cir. 1987). "Typically, the finder of the abandoned property acquires title to it. But, the law of finds contains an exception to this general rule. When the abandoned property is embedded in the land, it belongs to the owner of the land." *Zych*, 19 F.3d at 1141 n. 2

(citing *Klein v. Unidentified Wreck & Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir. 1985)).

There has, however, been some disagreement among the courts as to whether application of the law of finds or salvage to a shipwreck is proper. *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel Nuestra Senora de Atocha*, 569 F.2d 330, 337 (5th Cir. 1978) (application of salvage law to shipwreck "stretches a fiction to absurd lengths"); and *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir. 1985) (rejecting maritime law and applying common law of finds to determine ownership of abandoned shipwreck). "Where the owner has abandoned the ship, however, recent doctrine applies the law of finds, vesting title in the finder of the ship." *Fairport Intern. Exploration, Inc. v. Shipwrecked Vessel, Captain Lawrence*, 177 F.3d 491, 498 (6th Cir. 1999) (citing cases). As such, whether the sunken ship was abandoned determined which law applied, as well as who owns the ship. *Fairport*, 177 F.3d at 498. Further, "admiralty courts recognize a presumption against finding abandonment" to protect the property rights of owners. *Id*.

The ASA, enacted in 1987, displaces the maritime laws of finds and salvage with regard to any abandoned and embedded shipwreck. 43 U.S.C. § 2106(a) ("the law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies."). Specifically, under the ASA,

> The United States asserts title to any abandoned shipwreck that is:
> (1) embedded in submerged lands of a State;
> (2) embedded in coralline formations protected by a State on submerged lands of a State or;
> (3) on submerged lands of a State and is included or determined eligible

for inclusion in the National Register.

43 U.S.C. § 2105(a).

Such title of the United States to an abandoned shipwreck is then "transferred to the State in or on whose submerged lands the shipwreck is located." 43 U.S.C. § 2105(c). Accordingly, provided a shipwreck is both abandoned, and falls within any one of the three enumerated categories, the state whose submerged lands the shipwreck is embedded in, or lies on, acquires title to the shipwreck by operation of the ASA. *Trueman v. The Historic Steamtug New York*, 120 F.Supp.2d 228, 233 (N.D.N.Y. 2000). Nevertheless, the ASA does not change maritime laws of the United States relating to shipwrecks not subject to the ASA, *i.e.*, not abandoned.[18]

In the instant case, the parties do not dispute that the Dunkirk Schooner lies on or is embedded in the submerged lands of New York, a fact supported by both parties' experts. *See, e.g.*, Cohn Report ¶ 9 (stating the Dunkirk Schooner is "embedded on state-owned bottomlands"); CMURM Report at 5-7. As such, provided the Dunkirk Schooner is abandoned, the ASA applies, and title is vested in New York, and Plaintiff is left with neither title to the Dunkirk Schooner under the law of finds, nor a salvage award under the law of salvage. *Fairport*, 177 F.3d at 498 ("If a diver now discovers a long-lost ship embedded in the submerged lands of a State, a finding of abandonment leaves the diver with neither title nor a salvage award . . . ."). If, however, the Dunkirk Schooner is not abandoned, then neither the ASA nor the maritime law of finds applies,

_____

[18] Not discussed by the parties, or in any legislative comments accompanying the ASA, is that the ASA's provision that "[t]he law of salvage . . . shall not apply to abandoned shipwrecks . . . .," 43 U.S.C. § 2106(a), is superfluous given that the law of salvage does not apply to abandoned shipwrecks. *See Zych*, 19 F.3d 1136, 1141 (commenting that *§ 2106(a)* "has no effect on the law of salvage because the law of salvage does not apply to abandoned shipwrecks." (citing cases)).

and, although title would vest in neither NorthEast nor New York, Plaintiff could be granted a salvage award. As such, the court's first inquiry is whether the record establishes the Dunkirk Schooner is abandoned.

Whether abandonment is the same under maritime law and the ASA has been the subject of much litigation. Under maritime law, "admiralty courts have recognized a presumption against finding a ship abandoned." *Trueman v. The Historic Steamtug New York*, 120 F.Supp.2d 228, 233 (N.D.N.Y. 2000) (citing *Hener v. United States*, 525 F.Supp. 350, 356-57 (S.D.N.Y. 1981)), *appeal dismissed*, 14 Fed. Appx. 106 (2d Cir. 2001). "Because of this presumption, courts in this Circuit have long demanded a high degree of proof in order to prove that an owner has abandoned a vessel." *Id*. (citing *P.C. Minch*, 73 F. 859, 865 (2d Cir. 1896) (stating that for a court to find abandonment of a ship in a claim for salvage, the abandonment must be "absolute, without hope or expectation of recovery.")). Generally, under the maritime law, abandonment by express acts is required. *Fairport*, 177 F.3d at 499 (citing cases). In the instant action, nothing in the record establishes that the Dunkirk Schooner was expressly abandoned. Accordingly, the Dunkirk Schooner will only be considered abandoned under an inference of abandonment.

Although until the ASA's passage in 1987, admiralty courts "interpreted 'abandoned' primarily when deciding whether to apply the law of salvage or of finds." *Fairport*, 177 F.3d at 498-99, "[t]he ASA departed from maritime law by insulating abandoned shipwrecks from the law of salvage and finds, . . . the Act did not affect the meaning of 'abandoned,' which serves as a precondition for the invocation of the ASA's provisions." *Id*. at 499 (citing 43 U.S.C. § 2106(a)). On the issue of abandonment, the

ASA provides only that "States have the responsibility for management of a broad range of living and nonliving resources in State waters and submerged lands; and included in the range of resources are certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101. Although the ASA itself provides no guidance on whether "express abandonment" is required, or whether courts may draw an "inference of abandonment," the ASA's legislative history states that

> the term "abandoned" does not require the original owner to actively disclaim title or ownership. The abandonment or relinquishment of ownership rights may be implied or otherwise inferred, as by an owner never asserting any control over, or otherwise indicating his claim of possession of the shipwreck."

H.R. Rep. No. 100-514(I) (1988), 1988 U.S. Code Cong. & Admin. News 365, 366. This comports with Congress's recognition, in enacting the ASA, that divers, archeologists, and salvors place conflicting demands on abandoned shipwrecks, that can best be avoided by vesting title and management authority on such shipwrecks with the various states. *Trueman*, 120 F.Supp.2d at 234 (citing H.R. Rep. No. 100-514(I) (1988).

Although the contrasting approaches to determining abandonment appears to create a conundrum, *i.e.*, a determination that a shipwreck is not expressly abandoned would prevent a determination of an inference of abandonment under the ASA, such is not the case. Rather, some of the cases applying the maritime law of finds contain language suggesting that express abandonment is not always required. *See*, *e.g.*, *Columbus-America*, 974 F.2d at 464-65 ("Such abandonment must be provided by clear and convincing evidence, though, such as an owner's express declaration abandoning

title. *Should the property encompass an ancient and long lost shipwreck, a court may infer an abandonment*." (italics added)); *Wiggins v. 1100 Tons, More or Less, of Italian Marble*, 186 F.Supp. 452, 456 (E.D. Va. 1960) ("While lapse of time and nonuser [*sic*] are not sufficient, in and of themselves, to constitute an abandonment, these factors may, under certain circumstances, give rise to an implication of intention to abandon."). As such, the court finds that an inference of abandonment is sufficient to bring the action within the ASA, thus displacing the maritime law of finds and salvor.[19] Moreover, clear and convincing evidence in the record establishes an inference of abandonment.

_____

[19] Although not discussed by the parties, the ASA's inference of abandonment standard is not intended to apply to sovereign shipwrecks where another nation asserts ownership over the vessel. *See Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 641 (4th Cir. 2000) ("Under the ASA, then, an implied abandonment standard would seem least defensible where, [ ], a nation has stepped forward to assert ownership over its sovereign shipwrecks." (citing H.R. Rep. No. 100-514(II), at 13 (1988), *reprinted in* 1998 U.S.C.C.A.N. at 381)). Nevertheless, even assuming, *arguendo*, the Dunkirk Schooner is, in fact, the British-built *Caledonia*, there is no basis for any claim by Great Britain to the *Caledonia*. Specifically, upon capturing the *Caledonia* from the British, title to the vessel was vested in the United States. *See The Florida*, 101 U.S. 37, 42 (1879) ("The title to captured property always vests primarily in the government of the captors."). Such title, however, is not perfected until the vessel is "condemned as prize in a regular judicial proceeding in which all interested parties may be heard." 2 Benedict on Admiralty, ch. XI, § 152 (7th ed.) "In the United States, the only courts endowed with original jurisdiction to hear proceedings in cases of prize and its incidents are the district courts which adjudicate such cases as a part of their regular function as courts of admiralty. *Id*. *See also* 2 Benedict of Admiralty, ch. XI, § 151.b (as relevant to the instant case, "'district courts have original jurisdiction, exclusive of the courts of the States, of each prize and each proceeding for the condemnation of property taken as prize,'" provided the property is brought into the United States (quoting Text of United States Prize Act of 1956 § 7652)). Plaintiff maintains, and Claimant does not dispute, that following its capture by the United States from the British, the *Caledonia* was made an American war prize vessel in 1812. CMURM Report at 14 ("[The *Caledonia*] participated in the British attack on American defenders of Fort Michilimackinac in 1812 before being captured later that October on the Niagara River by Lieutenant Jesse D. Elliot of the U.S. Navy and his collaborators, and made a [war] prize vessel (Gough 2006: 51, 59; Buffalo Gazette, November 24 and October 13, 1923)."). Nevertheless, even absent order of a prize court quieting title to the subject vessel, that the *Caledonia* remained in the possession of the United States when the Treaty of Ghent, ending the War of 1812, was signed on December 24, 1814, and ratified by the United States Senate in February 1815, is significant because "'[c]aptured property remains in the same condition in which the treaty finds it, and it is tacitly conceded to the possessor. The intervention of peace cures all defects of title,'" *Jecker v. Montgomery*, 54 U.S. 498, 512 (1851) (quoting 1 Kent. ch. 5, 111; ch. 8, 169), even where the captured vessel claimed has not been condemned in a prize court. *Id*. (citing *In re The 'Schoone Sophie*,' (1805) 165 Eng. Rep. 878, 880; 6 C. Rob. 138, 141-42 (Sir Walter Scott holding, "I am of the opinion that the title of the former owner is completely barred by the intervention of peace, which has the effect of quieting all titles of possession arising from the war. . . ."). Any dispute over the validity of the title the United States transferred to the *Caledonia* to Reed and Dickson therefore would be baseless.

Specifically, that the Dunkirk Schooner was likely shipwrecked prior to 1850, is not disputed by Claimant, *see* Claimant's Memorandum at 6 (quoting Cohn Report ¶ 86 ("[a]bandonment in this case can be strongly inferred from the plausible circumstances that this schooner disappeared from the surface over 150 years ago to become another victim of the Great Lake's power."); and is consistent with Plaintiff's assertion that the Dunkirk Schooner may be the *Caledonia/General Wayne* which was used in connection with the Underground Railroad to smuggle slaves across Lake Erie to freedom in Canada, and which likely sank during such a voyage, sometime in the middle of the 19th century. *See* NorthEast's Archeological Expert's Report[20] at 24 (observing that 1834 "was the height of the Underground Railroad activity on Lake Erie."). This conclusion also is consistent with the fact that among the numerous coins found inside the vessel, the newest coin is dated 1834. *Id*.

Significant also is that although it is undisputed that Reed and Dickson owned the *Caledonia/General Wayne* when the vessel was shipwrecked, there is no evidence that either Reed or Dickson ever attempted to salvage the vessel. That the vessel came to rest in 170 feet of water, and is located in one of the deepest parts of Lake Erie, would not have prevented its recovery because the technology needed for such a recovery effort existed at least by 1855. *See* Cohn Report ¶ 86 (explaining that the Steamboat Atlantic which sank in 160 feet of freshwater was salvaged in 1855). Nor is there any evidence indicating that either Reed or Dickson, or any descendent or devisee of either owner, attempted to raise the funds necessary to salvage the vessel,

---

[20] Hess Declaration Exh. I

or even undertook any attempt to locate the vessel despite the fact that deep-sea diving has been possible since the 1930s. *See Fairport Intern. Exploration, Inc.*, 245 F.3d 857, 865 (6th Cir. 2001) (observing that by 1933, deep sea diving to locate wrecked ships was technologically feasible). In fact, even the putative Mays Assignment to NorthEast, Hess Declaration Attachment III, fails to describe earlier attempts at salvaging the vessel, or an explanation as to why no such attempts were made.

With further regard to the Mays Assignment, Plaintiff fails to explain how such assignment can effectively transfer title from Mays to Plaintiff, given evidence in the record establishes at least five other "heirs" to the *Caledonia/General Wayne*, none of whom have similarly assigned their rights to the vessel to Plaintiff. In particular, a copy of an obituary for Charles Manning Reed, VI, ("Charles Reed")[21] father of Mays and great great grandson of Rufus Reed, mentions survivors of Charles Reed, besides Mays, who would also be direct descendants of Rufus Reed, including another daughter, Sara Gomolchak, a cousin, also named Charles M. Reed, and Peter R. Ransom, who is a nephew of a predeceased sister of Charles Reed. If the *Caledonia/General Wayne* is not abandoned, and if title to the vessel has not, pursuant to the ASA, vested in the United States and, by operation of law, been transferred to New York, then not only would the descendent of Rufus Reed be able to maintain a claim to the vessel, but so would any descendants of John Dickson, the other Pennsylvania merchant who joined with Reed in purchasing the *Caledonia* from the United States in 1816. Notably, Claimant has submitted in support of summary

---

[21] Hess Declaration Attachment III.

judgment a Declaration by one Nancy Potter (Doc. No. 60), who maintains that, as a direct descendent of John Dickson, she has repeatedly denied requests from Mr. Hess to assign any ownership interest in the vessel to Plaintiff. Potter Declaration ¶ 4. Potter also states that she has a mother and brother with potential ownership rights in the vessel, which have not been relinquished or assigned. *Id*. As such, even if the Defendant Vessel is, as Plaintiff urges, the *Caledonia/General Wayne*, the Mays assignment is not sufficient to convey ownership to Plaintiff.[22]

That the *Caledonia/General Wayne* was purportedly used to ferry fugitive slaves across Lake Erie to freedom in Canada, which Plaintiff maintains explains the complete absence of any exterior identifying markings on the Dunkirk Schooner, Plaintiff's Undisputed Facts ¶ 55 (citing Archaeological Site Assessment Prepared by James Sinclair, MA ("Sinclair Assessment"[23]) at 23-25; Kullberg Deposition T. at 235-40; and Identity of the Dunkirk Wreck: Assessment of the Schooner CALEDONIA as a Probable Candidate, Opinion Paper by Peter J. Rindlisbacher, Ph.D. ("Rindlisbacher Opinion Paper"[24]), at 1-2), could, Plaintiff implies, have caused Reed and Dickson to abandon the *Caledonia/General Wayne* for two reasons, including (1) that if the *Caledonia/General Wayne*'s cargo mainly consisted of fugitive slaves, the sinking of the

---

[22] The record is devoid of any indication that Plaintiff ever attempted to determine whether Reed or Dickson left any will bequeathing ownership in the shipwrecked vessel to anyone, or died intestate such that their respective ownership interests passed to their descendants through the applicable state's laws of intestacy. Even assuming some probate record for the estate of Reed and Dickson could be found, thereby establishing whether either owner died intestate, further inquiry into the estates of all successive descendants and devisees would be necessary to determine who now possesses ownership interest in the Defendant Vessel, thus rendering the assignment irrelevant.

[23] Hess Declaration Attachment I.

[24] Hess Declaration Attachment II, Exh. C.

vessel likely led to the slaves' demise, such that there would be no cargo to salvage, and (2) fear of prosecution for smuggling fugitive slaves.[25]  Further, if the Dunkirk Schooner is, in fact, the *Caledonia/General Wayne*, which was built in 1799, then upon its sinking no earlier than 1834, the vessel was at least 35 years old, which is the upper age limit for a schooner at that time, such that the vessel was likely in poor condition and not independently valuable.  If, as Claimant maintains, the cargo on the Dunkirk Schooner was mostly grain and hickory nuts, the value of such waterlogged cargo would not have supported any salvage attempt.

Moreover, on December 4, 1990, the Department of the Interior, acting through the National Parks Service under the authority of § 5 of the Abandoned Shipwreck Act, 43 U.S.C. § 2104(c) issued "final 'Abandoned Shipwreck Act Guidelines' . . . . to assist the States and the appropriate Federal agencies in developing legislation and regulations to carry out their responsibilities under the Act."  Abandoned Shipwreck Act Guidelines ("the Guidelines"), 55 FR 50116, 1990 WL 349323 (Dec. 4, 1990).  Relevant to the instant case, the guidelines provide that

> Abandoned shipwreck means any shipwreck to which title voluntarily has been given up by the owner with the intent of never claiming a right or interest in the future and without vesting ownership in any other person.  By not taking any action after a wreck incident either to mark and subsequently remove the wrecked vessel and its cargo or to provide legal notice of abandonment to the U.S. Coast Guard and the U.S. Army Corps of Engineers, as is required under provisions in the Rivers and Harbors Act (33 U.S.C. 409), an owner shows intent to give up title.  *Such shipwrecks ordinarily are treated as being abandoned after the expiration of 30 days from the sinking*.

---

[25] Regardless of whether the ship sank before the enactment of the Fugitive Slave Act of 1850, 9 Stat. 464, Reed and Dickson could have faced liability under the Fugitive Slave Act of 1793, 1 Stat. 305, which gave to slave owners a right of action against any person who assisted an escaped slave in avoiding capture and traveling to freedom.

Abandoned Shipwreck Act Guidelines, 55 FR 50116, 50121 (Dec. 4, 1990) (italics added).

Although such interpretive Guidelines "lack the force of law," they nevertheless "bring the benefit of [an agency's] specialized experience to bear on the meaning of a statute, [and] are still entitled to 'some deference.'" *United State v. Mead Corp.*, 533 U.S. 234-35 (2001). In the absence of any evidence that either Reed or Dickson took any action to attempt to remove the vessel or its cargo, or to even mark the area where the shipwrecked vessel sank, the Guidelines thus only support the determination that the Dunkirk Schooner is abandoned.

Accordingly, there is sufficient evidence in the record establishing an inference that the Dunkirk Schooner is abandoned, as required for application of the ASA. Because the Dunkirk Schooner both is embedded on the submerged lands of New York, as well as listed on the National Registry, New York has acquired title to the vessel by operation of law, *i.e.*, 43 U.S.C. § 2105(a)(1) and (3). Further, insofar as Plaintiff maintains it is entitled to a salvage award from New York, because the ASA specifically provides that "the law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies," 43 U.S.C. § 2106(a), no such award can be made to Plaintiff.

Claimant alternatively asserts it has title to the Dunkirk Schooner pursuant to the Submerged Lands Act ("the SLA"), 43 U.S.C. § 1301 *et seq*. Claimant's Memorandum at 12. Plaintiff has not responded to this argument.

Enacted on May 22, 1953, the SLA transfers ownership to each state of all natural resources and submerged lands "three geographical miles distant from its coast

line or, in the case of the Great Lakes, to the international boundary." 43 U.S.C. §

1312. Congress, however, "did not specify in the SLA whether the state also owned

non-natural objects such as shipwrecks that rested on or within submerged lands."

H.R. REP. NO. 100-514(II) (1988), *reprinted in* 1988 U.S.C.C.A.N. 370. Although at least

28 states passed laws pertaining to the management of abandoned or historic

shipwrecks located in state waters, asserting title to such shipwrecks and prescribing

regulations for the protection and salvaging of wrecks of historic significance, no such

laws prohibited access by sport divers. *Id*. at 370-71. Such state laws frequently

conflicted with federal common law admiralty principles, which superseded the state

laws. *id.* at 371. It was these deficiencies in the SLA and existing state laws that

Congress sought to eradicate by enacting the ASA. *Id*.

As such, nothing within the SLA grants Claimant title to the Dunkirk Schooner.

Summary judgment should thus be GRANTED in favor of Claimant with a declaration

that New York holds title to the Dunkirk Schooner pursuant to the ASA, but not under

the SLA, and DENIED as to Plaintiff. The Clerk of the Court should be directed to close

the file.

## 4.  State Law

Claimant alternatively, should the District Judge find the ASA to be inapplicable

to resolution fo Plaintiff's claim, asserts title to the Dunkirk Schooner pursuant to

several New York laws, including New York Education Law ("N.Y. Educ. Law")[26] § 233

---

[26] Unless otherwise indicated, references to N.Y. Educ. Law are to "McKinney's 2009."

("§ 233"), Claimant's Memorandum at 13-15, New York Public Lands Law ("N.Y. Pub. Lands Law")[27] §§ 3, 4 and 75, *id.* at 15, and New York Navigation Law ("N.Y. Nav. Law")[28] §§ 2[33] and 130-a, *id.* at 15-16, as well as under principles of equity, *id.* 25-29. Although Plaintiff has not responded in opposition to these arguments, because Plaintiff alternatively seeks a salvage award, the court considers whether, under New York law, title to the Dunkirk Schooner is vested in Claimant, and, if so, whether Plaintiff should be granted a salvage award against New York.

### A. Education Law

Claimant maintains that certain sections of New York's Education Law have vested New York with title to the Dunkirk Schooner. Claimant's Memorandum at 13-15. Claimant, unchallenged by Plaintiff, explains that pursuant to N.Y. Educ. Law §§ 101 and 232, the State Museum, a division within the New York State Department of Education, is, pursuant to N.Y. Educ. Law § 233[1], vested with authority and has custody over all scientific specimens and collections, works of art, objects of historic interest, and similar property appropriate to a general museum owned by New York. Claimant's Memorandum at 13.

The disturbance or removal of objects of historic significance located on New York state lands is prohibited as a class A misdemeanor. N.Y. Educ. Law § 233[4]. "Permits for examination, excavation or gathering of archaeological, historical, cultural,

---

[27] Unless otherwise indicated, references to N.Y. Pub. Lands Law are to "McKinney's 1993").

[28] Unless otherwise indicated, references to N.Y. Nav. Law are to "McKinney's 2004."

social, scientific or paleontological objects" on New York lands may be granted by the state agencies with the relevant jurisdiction over the subject lands.  N.Y. Educ. Law § 233[5].  Such control over land is sufficient to create "constructive possession" over any shipwrecked vessels on the land.  *Aqua Log, Inc.*, 94 F.3d at 1336-37 (constructive possession may be found based on ownership, dominion or control over the premises on which the *res* is located, or knowledge of the *res*, combined with the ability to maintain control over or to reduce it to physical possession, without actual personal dominion).  *See* Discussion, *supra*, at 17-20.  The undisputed facts of this case, including that Claimant maintains a keen archaeological interest in the Dunkirk Schooner, which is located on the submerged lands of New York, establishes that, under New York's Education Law, New York is the owner of the Dunkirk Schooner.

### B.    Public Lands Law

Claimant maintains that because "New York, as a sovereign, owns the underwater lands and water column, *i.e.*, a conceptual column of water rising from the relevant bottom sediment of a body of water to the surface, of Lake Erie at and around Dunkirk, and other underwater lands and water bodies formerly held by the crown of Great Britain, not otherwise granted," in which the Dunkirk Schooner is embedded, New York holds title to the shipwrecked vessel pursuant to N.Y. Public Lands Law §§ 3 and 75.  As relevant to this action, N.Y. Pub. Lands Law §§ 3 and 75, the New York Office of General Services ("OGS") is vested with jurisdiction over and management of the underwater lands of New York not owned or managed by other New York agencies.  According to OGS employee Alan C. Bauder, a Real Estate Specialist II and manager

of the Submerged Lands and Natural Resources Unit in the Bureau of land

Management, Division of Real Property Planning and Development, OGS has

jurisdiction over New York-owned underwater lands, including navigable rivers and

lakes. Bauder Affidavit ¶ 4. Bauder further explains, and Plaintiff does not dispute, that

the Dunkirk Schooner is located on, and embedded in New York-owned underwater

lands of Lake Erie. *Id*. ¶ 6. As previously discussed, Discussion, *supra*, at 22, under

common law, title to personal property embedded in real property is vested in the owner

of the real property in which the personal property is embedded. *Zych*, 19 F.3d at 1141

n. 2 ("When the abandoned property is embedded in the land, it belongs to the owner of

the land."). Accordingly, title to the defendant vessel is vested in New York pursuant to

N.Y. Pub. Lands Law §§ 3 and 75.


### C. Navigation Law

Claimant asserts title to the Dunkirk Schooner pursuant to N.Y. Navigation Law

§§ 2[33] and 130-a and the Submerged Lands Act, 43 U.S.C. § 1311. Claimant's

Memorandum at 15-16. Pursuant to N.Y. Nav. Law § 130, the sheriff of any county in

which submerged wrecked property is found is required to "take all necessary measures

for saving and securing such property, "to take possession of such property "in the

name of the people of the state," have the value of the property appraised by

disinterested persons, and keep the property safe "to answer the claims of the persons

entitled thereto." N.Y. Nav. Law § 130-a clarifies that § 130 "deals with recovery and

salvage of only those wrecks which are not abandoned historic shipwrecks." Under

N.Y. Nav. Law § 2, an "abandoned historic shipwreck" is defined as

wrecks situated on or under lands owned by the state, in which the state holds title pursuant to the Abandoned Shipwrecks [*sic*] Act of 1987 (43 U.S.C. § 2101) or which, by reason of their antiquity, history, architecture, archaeology or cultural value, have state or national importance and are eligible for inclusion on the state register of historic places, and which have been abandoned by the owner of record. The term shall include the wreck, its cargo and contents and the situs.

N.Y. Nav. Law § 2[33].

The ASA vests title to an abandoned shipwreck in the state in whose submerged lands the wreck is embedded, or on whose submerged lands the wreck lies provided the wreck is eligible for inclusion in the National Register, Discussion, *supra*, at 23-24, whereas N.Y. Nav. Law § 130-a applies only to those shipwrecks that are other than "abandoned historic shipwrecks," thereby vesting in New York title to all those abandoned shipwrecks on its underwater lands, yet outside the scope of the ASA.

Claimant, however, does not assert that the Chautauqua County Sheriff[29] has, as required under § 130, taken any necessary measures to save and secure the Defendant shipwreck, taken possession of such property in the name of the people of New York, had the property appraised by a disinterested person, or kept the property safe for the claims of any persons entitled thereto. As such, although the record establishes title to the Dunkirk Schooner would vest in New York upon such undertakings by the Chautauqua County Sheriff, absent such required action, there is no basis for finding title to the Dunkirk Schooner has vested in New York pursuant to N.Y. Navigation Law. Thus, Claimant's motion should be DENIED as to this ground.

---

[29] The court takes judicial notice that Dunkirk is located within Chautauqua County.

**D.      Request for Salvage Award**

Because the undersigned addresses Claimant's assertions that title to the Dunkirk Schooner is vested in New York pursuant to New York law only in the alternative should the District Judge disagree with the initial recommendation that New York holds title pursuant to the ASA, the court also addresses whether Plaintiff's request for a salvage award based on Claimant's ownership of the vessel pursuant only to New York Education and Public Lands Law.  Plaintiff claims it is entitled to a liberal salvage award against New York for having voluntarily and successfully rescued the Dunkirk Schooner and its artifacts from certain marine peril.  Plaintiff's Memorandum at 21-25.  Plaintiff maintains that to date it has spent "well over" $ 1 million on its archaeological investigation, which required the use of "valuable assets" including diving support vessels, sophisticated underwater photography equipment, a water induction dredge, and technical diving gear.  *Id*. at 23.  Plaintiff further urges that although the recovered artifacts have not yet been appraised, the court can take judicial notice that the aggregate value of such artifacts

> likely do not have an aggregate value approaching the cost of [Plaintiff's] outlay for this project to date.  Instead, it is the completeness of the collection and its association with one of the Great Lake's most pristine and intact shipwreck which makes the [*Caledonia/General Wayne*] a priceless historic asset for Western New York and the region as a whole.

*Id*. at 23.

Claimant opposes any salvage award on principles of equity, maintaining that the archaeological methods Plaintiff employed with regard to the Dunkirk Schooner, including recovering artifacts, including human remains, do not comport with the archaeological protocols Plaintiff promised to follow, and have resulted in the

desecration of human remains at the shipwreck site. Claimant's Memorandum at 26-28. As such, a salvage award to Plaintiff would be contrary to public policy. *Id*. at 28.

That this salvage claim is within the admiralty jurisdiction of this court is not disputed. "The law of salvage originated to preserve property and promote commerce." *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983) (citing cases). To accomplish such purposes, courts of admiralty do not view salvage awards 'merely as pay, on the principal of a *quantum meruit*, or as a remuneration *pro opere et labore*, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property.'" *Id*. at 338 (quoting The Blackwall, 77 U.S. (Wall.) 1, 14 (1870)). "For these reasons, courts sitting in admiralty are liberal in fixing awards." *Id*. (citing *The Felix*, 62 F. 620, 622 (D.C. Pa. 1894)).

"The law of salvage generally governs efforts to save vessels in distress. Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents. A court then fashions an appropriate award for the salvors' services." *Int'l Aircraft Recovery v. Unidentified Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000). "Salvage, simply stated, is the 'service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from distress or danger either present or to be reasonably apprehended." *B.V. Bureau Wijsmuller*, 702 F.2d at 338 (quoting *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y. 1881), *modified*, 15 F. 545 (C.C.S.D.N.Y. 1983)).

Three kinds of salvage services have been recognized, including salvage services that are "(1) voluntary, wherein the compensation is dependent upon success;

(2) rendered under a contract for per diem or per horam wage, payable at all events; or

(3) under a contract for a compensation payable only in cases of success."  *The Elfrida*,

172 U.S. 186, 192 (1898).  The first salvage type is most relevant to the instant case,

and is commonly referred to as "pure salvage." *Id*.  A claim for a pure salvage award

requires establishing by a preponderance of the evidence each of the following

elements: (1) marine peril; (2) service voluntarily rendered, not required by duty or

contract; and (3) success, either complete or partial, resulting from the voluntarily

rendered services.  *The Sabine*, 101 U.S. 384 (1879); *B.V. Bureau Wijsmuller v. U.S.*,

702 U.S. 333, 338 (2d Cir. 1983).

"While the law of salvage provides substantial protection to salvors to encourage

their saving of life and property at sea, it also imposes duties of good faith, honesty,

and diligence in protecting the property in salvors' care.  *R.M.S. Titanic, Inc. v. Haver*,

171 F.3d 943, 963-64 (4th Cir. 1999).  Salvors thus "have to exercise a trust over the

property for the benefit of the owner and subject to any orders of a court." *Id*. at 964

(citing *Cromwell v. The Bark Island City*, 66 U.S. (1 Black) 121 (1861)).  In fact, salvors

are entrusted not to remove property from the wreck for their own use or to use any

removed for their own use such that "[w]hen a violation of this trust occurs, a salvage

claim is forfeited." *Id*. (citing *Danner v. United States, the Royal Oak*, 99 F.Supp. 880,

884 ((S.D.N.Y. 1951) ("courts of admiralty in salvage cases, while rewarding meritorious

and selfless service most generously and far in excess of a mere quantum meruit,

likewise require of those seeking such liberal reward the highest standards of conduct

and good faith.").  Even when a savlor mistakenly takes property for his own use, the

right to a salvage award is forfeited.  *Id*.

"The maritime code in respect to the allowance of compensation for salvage-services is based upon principles of universal equity and integrity." *James v. The Sarah A. Boice*, 12 F.Cas. 318, 318 (S.D.N.Y. 1865). As such, a salvage award "must be supported by proof that the motives and proceedings of the libelants were in all respects lawful, in good conscience, and meritorious." *Id*. The plunder of wrecked property, however, does not constitute lawful salvage. *Id*. at 318-19 ("the whole purpose evinced was to embezzle, confiscate, and appropriate to themselves the ruins of the vessel and her effects, and no evidence is furnished that one individual of the multitude which flocked around the wreck evinced the slightest purpose to save her for the unfortunate proprietors."). In fact, "[d]espoilers and plunderers of distressed, derelict and wrecked property make themselves subject to criminal prosecution." 3A Benedict on Admiralty, ch. 8, § 102. *See also* N.Y. Educ. Law § 233[4] (providing that a violation of § 233[4] permit requirements constitutes a class A misdemeanor). In the instant case, the record does not support a finding that Plaintiff undertook the salvage operations for the benefit of the Defendant Vessel's owner but, rather, for Plaintiff's own economic benefit and, further, that Plaintiff's salvage attempts are more properly characterized as "plundering," such that Plaintiff is not entitled to a salvage award.

Significantly, according to the Complaint, Plaintiff initially sought a salvage award not for the benefit of the Defendant Vessel's owner but, rather, "to return the salvaged portions of the shipwreck to the stream of commerce from which they were lost." Complaint ¶ 16. It was not until after applying for the § 233 Permit, which required Plaintiff to turn over any recovered artifacts to a curator, that Plaintiff released any of the recovered artifacts from its custody. In fact, even after obtaining the § 233 Permit,

Plaintiff only placed four of the fifteen recovered artifacts listed in the CMURM Report, CMURM Report, Exh. D, in the custody of MAI, the curator.[30]

Nor did Plaintiff employ the proper archaeological excavation techniques to preserve the shipwreck site. For example, Dr. Rieth explains that although each artifact recovered from the Dunkirk Schooner has a "provenience" in time and space, referring to the "date of use" and "the precise three-dimensional position of the find within the matrix (or physical substance that surrounds the find)," Dr. Rieth Declaration ¶ 11, Plaintiff's divers neglected to record the provenience of each artifact recovered from the Dunkirk Schooner. Dr. Rieth Declaration ¶ 35. Further, damage to the shipwreck site was among the reasons the § 233 Permit was revoked on October 21, 2008. Dr. Rieth October 21, 2008 Letter at 1-2. Specifically, the § 233 Permit was suspended on October 21, 2008 based on Plaintiff's violations of certain conditions, including the removal and dismantling of planks from the schooner's cabin roof, dredging the cabin of its contents and the haphazard deposit of a table and other furniture on the vessel's deck, "resulting in a loss of contextual information from the association of materials contained in the shipwreck," the recovery and removal of human remains from the vessel's cabin without the requisite notice to the Commissioner of Education and the State Museum, and the continued diving at the shipwreck beyond the § 233 Permit's expiration date of September 30, 2008. Dr. Rieth October 21, 2008 Letter at 1.

Although Plaintiff now attributes such damage to the conduct of "interlopers," Plaintiff's Undisputed Facts ¶¶ 25-26, and 28, nothing in the record establishes that

---

[30] Pertinently, Plaintiff does not assert any benefit to New York based on the removal of any artifacts from the shipwreck, either before or after obtaining the § 233 Permit.

Plaintiff put forth such argument to Dr. Rieth in response to the § 233 Permit suspension. Further, Plaintiff's attribution of damage to the vessel to a certain interloper, Herbert and his diving charter company Osprey Charters, whose charter vessel "repeatedly dragged its anchor across the fragile DS [Dunkirk Schooner] in a futile effort to secure a grapple to the vessel so that his divers could access the arrested shipwreck," Plaintiff's Undisputed Facts ¶ 22 (citing Declaration of Richard Kullberg (Doc. No. 22) ("Kullberg Declaration"), filed May 24, 2006), is not supported by the referenced documents. In particular, in a "2005 Dive Report" ("Dive Report"), attached to the Kullberg Declaration, and based on a September 19, 2005 dive, Herbert describes the shipwreck as "very intact." Dive Report at 3. Although Herbert states "there was considerable difficulty in getting the wreck hooked, and after many valiant but fruitless attempts, it was decided to simply dive a shot line to the wreck," Dive Report at 1, there is no mention of the repeated dragging of an anchor across the vessel, nor any damage to the vessel as a result. Therefore, Plaintiff does not assert a conferred benefit based on the deterrence of interlopers.

Evidence thus establishes that Plaintiff did not undertake salvage operations of the Dunkirk Schooner for the benefit of the owner, *i.e.*, New York. Further evidence in the record establishes that Plaintiff's actions at the shipwreck site amounted to little more than plundering and despoiling the vessel, such that Plaintiff has forfeited any right to a salvage award. See *R.M.S. Titanic, Inc.*, 171 F.3d at 964.

Accordingly, insofar as New York holds title to the Dunkirk Schooner only pursuant to New York law, such that the ASA does not preclude a salvage award, Plaintiff's motion for a salvage award should be DENIED.

## CONCLUSION

Based on the foregoing, Claimant's motion for summary judgment (Doc. No. 41),

should be GRANTED; Plaintiff's motion for summary judgment (Doc. No. 51), should be

DENIED.  The Clerk of the Court should be directed to close the file.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:  May 27, 2010
Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      May 27, 2010
              Buffalo, New York